UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | DOCKET NO. 3:22-CR-30025-MGM |
| DANIEL A. AUGUSTO, JR. | ) ) ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

STATEMENT OF FACTS

On February 17, 2022, Special Agent John McKee (SA McKee) of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) applied for warrants to search the following areas/persons/electronic records: 5 Robert Drive, Holyoke, MA (5 Robert Drive) (search warrant No. 22-mj-3027-KAR), Facebook records for account with username dan.augusto.9 (search warrant No. 22-mj-3028-KAR), Yahoo e-mail records for the e-mail address pops1002@yahoo.com (search warrant No. 22-mj-3029-KAR), and the person of the Defendant, Daniel Augusto, Jr. (search warrant No. 22-mj-3030-KAR). (Exhibits 1 – 4). SA McKee provided the Court with a single affidavit in support of all four warrants. (Exhibit 5).

According to SA McKee's affidavit, in October of 2020 the ATF learned that an individual named Timothy Watson "operated an online retail business, 'portablewallhanger.com,' that purported to sell innocuous 3D-printed, two-piece hooks; however, when disassembled, one of the pieces functions as an illegal Auto Sear that converts a semi-automatic AR-15 rifle into a fully automatic machinegun." (Exhibit 5, ¶ 27). On or about October 26, 2020, the ATF obtained the self-described hooks from portablewallhanger.com and confirmed that they functioned as Auto Sears. (Id.) PayPal records from the website portablewallhanger.com showed a purchase of a

1

family sized wall hanger on February 9, 2020 for $36.48 by "Tombstone Productions" with a listed e-mail address of "pops1002@yahoo.com" and shipping information of "Dan Augusto, 5 Robert Drive, Holyoke, MA 01040". (Id., ¶ 30). A public search of the Dun & Bradstreet online business directory for Tombstone Productions dated January 6, 2021 revealed that Tombstone Productions is located at 5 Robert Drive, Holyoke, MA, its contact person is "Dan Augusto", and its contact phone is (413) 534-5238. (Id., ¶ 31). PayPal records of registration information for the users "Daniel Augusto," "Dan Augusto," and "Daniel Augusto, Sr." revealed listed addresses of 5 Robert Drive, Holyoke, MA, 52 Taylor Street, Holyoke, MA, and 179 Daggett Drive, West Springfield, MA; listed e-mail accounts of pops1002@yahoo.com, daugusto@comcast.net, daugusto@rcn.com, and daugusto@javanet.com; listed telephone numbers of (413) 534-5238, (413) 537-3510, and (413) 210-4223; and a listed business name of Tombstone Productions. (Id., ¶ 32).

Records for said PayPal account showed the following transactions with a company called Alipay Singapore E-Commerce Private Limited: a $73.55 purchase of a "8.6 inch OD 1.7 Aluminum Car Fuel Filter Solvent Traps cups adapter 5/8x24 & 1/2x28 For NAPA 4003 WIX 24003" on December 20, 2020, and a $99.89 purchase of an "Aluminum sprial [sic] 1/2x28 Fuel Filter For NaPa [sic] 4003 Car 8.8 inch solvent traps adapter US" on December 24, 2020. (Id., ¶ 33). PayPal records for both transactions listed pops1002@yahoo.com as the "From E-Mail Address" and 5 Robert Drive, Holyoke, MA as the shipping address. (Id., ¶ 34).

> [S]olvent traps are devices attached to the muzzle of a firearm barrel designed to catch or "trap" dirty cleaning solvent pushed through the barrel from the chamber end and out through the muzzle. Solvent traps are intended to prevent solvent from dripping, spraying, or spattering when pushed out the muzzle end of a firearm barrel. The front endcap of a solvent trap must be solid and have no hole that will allow a projectile to pass-through (including "pilot" holes that can be widened to allow a projectile to pass-through or marks indicating the location to drill such a

2

hole). Devices that have a hole in or indexing mark for a hole in the front endcap are classified as a "firearm silencer" under the NFA." (Id., ¶ 36).

According to SA McKee "[t]he thread diameters "1/2x28" and "5/8x24" listed in the product descriptions of the "fuel filter" / "solvent trap" items in the Augusto PayPal records for the December 20, 2020 and December 24, 2020, indicate the items come with adapters in those dimensions. Based upon my training and experience, these described adapters match the diameters of the threads that are commonly found on the end of barrels for most 5.56 / .223 caliber, .308 caliber, 9mm caliber, and .22LR caliber firearms." (Id., ¶ 37).

SA McKee's affidavit included the following portions of a letter dated October 30, 2020 from Holyoke Police Department ("HPD") Officer Andrew Urbanski ("Officer Urbanski") to HPD Lieutenant James Albert. (Id., ¶ 39).

> I have known D. Augusto for at least the last 15 or so years from my involvement working at McCray's Farm and assisting with the Haunted Hayride in which D. Augusto runs and operated. [] During my time working for him, he would always talk about different guns he has. He mentioned on several occasions that he has the capabilities to make his Glock pistols go fully automatic and had large capacity magazines for them. He also talked about high capacity rifles he has like the UZI and UMP he has and mentioned how he orders drop in trigger kits for his assault rifles to make them fully automatic. He also spoke about having "cans" which was a reference to a silencer. I am not sure if they are real ones or just a solvent trap style but nonetheless, he made it abundantly clear he had them. I do not believe he belongs to any firing range but rather just shoots out on McCray's property. Several years ago, he was shooting the insulators on the high tension wires and when confronted about it, denied shooting them and instead blamed the damage to them on another individual and myself. Regarding purchasing these weapons, I personally witnessed him at gun shows looking at guns, then handing his father a wad of cash and had his father purchase the guns. I confronted him about this and told him that this is a straw purchase. He denied everything saying the gun was for his father and they were not for him but a few weeks later he would be posting on "Facebook" that he purchased a new gun and it would be the same one from the gun show. I know he recently has connections to a gun shop in Turners Falls as well as another gun shop in Agawam where his son Tyler works. (Id.)

On October 6, 2021, Officer Urbanski stated to Federal Bureau of Investigation Special Agent Ryan McGonigle (SA McGonigle) that

> a. Augusto was looking to purchase illegal or legally questionable guns or gun paraphernalia;
> b. When Officer Urbanski was serving in the United States Marine Corps ("USMC"), Augusto asked him if he could get or steal guns or night vision equipment from the USMC;
> c. When Officer Urbanski worked at the firearms manufacturer Smith &Wesson ("S&W"), Augusto talked with him about the S&W guns that could be altered to become fully automatic; and
> d. On approximately thirty to forty occasions, Augusto told him that he made his Glock handgun fully automatic. Augusto has also told him that he purchased items like a drop-in auto sear to make his weapons fully automatic. (Id., ¶ 41).

On October 7, 2021, SA McGonigle interviewed a former associate and co-worker of the Defendant, who stated:

> a. He knows Augusto because he used to work at McCray's Farm, where Augusto ran a Haunted Halloween exhibit. They connected over their shared interested in firearms;
> b. Augusto frequently talked about acquiring questionably legal weapons or buying items to convert legal weapons into illegal weapons;
> c. Specifically, Augusto stated that he had purchased a Glock trigger switch that converts a Glock into an automatic weapon, and drop-in auto sear that makes a semi-automatic assault rifle fire in an automatic manner. Augusto told him that the drop-in auto sear was a legal part but could not be placed into the gun. (Id., ¶ 42).

However, "[t]he former co-worker and associate also stated that he has distanced himself from Augusto and that it has been years since he spoke with Augusto about weapons." (Id., ¶ 42, n.6).

On July 25, 2019, officers from the HPD responded to 5 Robert Drive after the sudden death of the Defendant's father, Daniel Augusto, Sr. (Id., ¶ 43). "While at the home, the officers met with Augusto; Augusto's live-in girlfriend, Brigetann Reilly ("Brigetann"); and their respective adult sons, Tyler Augusto ("Tyler") and John Reilly ("John")." (Id.)

A review of a PeoplesBank account bearing the names of both the Defendant and his father and listing an address of 5 Robert Drive, Holyoke, MA revealed several firearms related transactions after the death of Daniel Augusto, Sr. (Id., ¶ 44). SA McKee's affidavit described the following transactions: a $164.90 purchase from Black Rifle Depot on March 27, 2020; a $64.98

purchase from 5D Tactical on March 30, 2020, a $478.13 purchase from The Gun Rack on October 13, 2020; a $573.75 purchase from The Gun Rack on November 27, 2020; and a $1,593.74 purchase from The Gun Rack on October 28, 2021. (Id., ¶ 45). A review of Massachusetts firearms records for Tyler revealed that the purchases from The Gun Rack corresponded to firearms registered to Tyler. (Id.) SA McKee's expressed a "belief" that these "may be straw purchases". (Id., ¶ 46).

A review of the PeoplesBank account also revealed the following check/wire payments to a company called Defense Distributed: "a. November 12, 2020: $1,790.90 with memo line 'Order 28428;' b. August 10, 2021: $213.90 with memo line 'Order 35850;' c. November 2, 2021: $224.75 with memo line 'Order 37686.'" (Id., ¶ 58). "Defense Distributed's website advertises various products, including the 'Ghost Gunner 3' or 'GG3,' which the company states 'allows you to manufacture firearms with confidence and ease, in the privacy of your own home.'" (Id., ¶ 53). "According to its website, Defense Distributed sells the GG3 for $2,500, including a $500 non-refundable deposit and excluding a shipping cost of $225." (Id., ¶ 55).

On January 2, 2022, SA McKee conducted physical surveillance of 5 Robert Drive and observed a motor vehicle in the driveway, which is registered to the Defendant at 5 Robert Drive. (Id., ¶ 65). On January 11, 2022, ATF Task Force Officer David Seidel observed three motor vehicles in the driveway of 5 Robert Drive, which were registered to the Defendant, Tyler, and Brigetann. (Id., ¶ 66). Massachusetts licensing records revealed that Tyler and Brigetann had valid licenses to carry firearms as of January 18, 2022. (Id., ¶ 67). On January 20, 2022, SA McKee again observed the Defendant's motor vehicle parked in the driveway of 5 Robert Drive. (Id., ¶ 68).

On February 16, 2022, SA McKee conducted queries of Firearms Ownership through the CJIS database for the Defendant, Tyler, Brigetann, John, and the Defendant's deceased father. (Id., ¶ 72). The query revealed 0 firearms registered to the Defendant, 35 registered to his deceased father, 90 registered to Tyler, 27 registered to Brigetann, and 0 registered to John. (Id.)

A review of a Facebook account with vanity name dan.augusto.9 which is suspected to belong to the Defendant, revealed firearms-related posts on November 2, 2021, November 19, 2021, December 2, 2021, and January 22, 2022. (Id., ¶¶ 115-117).

On January 25, 2022, SA McKee received the following information from Yahoo regarding the account with e-mail address pops1002@yahoo.com:

> b. The "full name" for the account is: "D. Albert Augusto, Sr.";
> c. The "birthdate" for the account is: "****-**-**";
> d. The "recovery emails" for the account: "daugusto@comcast.net Verified" – i.e., the same e-mail address listed on the third check to Defense Distributed and one of the e-mails listed for Augusto's Subject Facebook Account;
> e. The "recovery phones" for the account is: "+14135373510" – i.e. the same telephone number listed on the first two checks to Defense Distributed and listed for Augusto's Subject Facebook Account. (Id., ¶ 122).

On February 23, 2022, the Defendant received a telephone call from Holyoke Police Officer David Seidel and ATF Special Agents Michael Finnerty and Zachery Mercer, who requested to speak to the Defendant in person. (Exhibit 8, Affidavit of Daniel Augusto, Jr., ¶ 3). The Defendant met Officer Seidel and Special Agents Finnerty and Mercer in the parking lot of Stop and Shop located at 28 Lincoln Street, Holyoke, MA. (Id., ¶ 4). Officer Seidel and Special Agents Finnerty and Mercer informed the Defendant that they had obtained a search warrant for the Defendant's person as well as his residence at 5 Robert Drive. (Id., ¶ 5). Officer Seidel and Special Agents Finnerty and Mercer seized the Defendant's cellular telephone and the keys to his home from the Defendant's person. (Id., ¶ 6). Officer Seidel and SA Finnerty questioned the Defendant regarding certain items at 5 Robert Drive, including firearms. (Id., ¶ 8). The Defendant

6

answered their questions only because he knew that they had a search warrant and already had access to his home.  (Id., ¶ 9).

The Defendant then traveled from Stop and Shop to his home at 5 Robert Drive. (Id., ¶ 10). When the Defendant arrived, law enforcement officers were already in the process of searching his home. (Id., ¶ 11). While the search of 5 Robert Drive was still ongoing, ATF Special Agent Christopher Michalak and FBI Special Agent Dustin Farivar questioned the Defendant regarding items found inside his home and regarding online purchases that he had made. (Id., ¶ 13). The Defendant answered their questions only because they had a search warrant and already had access to his home and the items located therein.  (Id., ¶ 14).

## ARGUMENT

I. ALL EVIDENCE OBTAINED PURSUANT TO THE FOUR SEARCH WARRANTS SHOULD BE SUPPRESSED BECAUSE THE SEARCH WARRANTS WERE INVALID AND THE "GOOD FAITH" EXCEPTION TO THE EXCLUSIONARY RULE DOES NOT APPLY.

A. SA McKee's Affidavit Failed To Establish Probable Cause That 5 Robert Drive, The Person Of The Defendant, The Defendant's Cellular Telephone, The Defendant's Yahoo E-Mail Records, And The Defendant's Facebook Records Contained Evidence Of A Crime.

The Fourth Amendment to the United States Constitution (Fourth Amendment), "which guarantees the 'right of the people' to be secure from unreasonable government searches and seizures, provides that 'no Warrants shall issue, but upon probable cause.'" United States v. Lopes, 578 F. Supp. 3d 158, 161 (D. Mass. 2021) quoting **U.S. Const.** amend. IV. Inquiry into the sufficiency of a search warrant application is limited to the "four corners of the affidavit." United States v. Nelson-Rodriguez, 319 F.3d 12, 33 n.3 (1st Cir. 2003). The information contained in the affidavit "must demonstrate probable cause to believe that:  (1) a crime has been committed; and (2) enumerated evidence of the offense will be found at the place to be searched – the so called

7

'nexus' element." United States v. Kosta, No. 12-10226-DJC, 2013 WL 5934030, at *4 (D. Mass. Oct. 31, 2013) quoting United States v. Hicks, 575 F.3d 130, 136 (1st Cir. 2009).

"Probable cause to believe one has committed a crime is not enough necessarily to search a suspect's residence." United States v. Gianelli, 585 F. Supp. 2d 150, 165 (D. Mass. 2008) citing United States v. Feliz, 182 F.3d 82, 88 (1st Cir. 1999). See also Commonwealth v. Pina, 453 Mass. 438, 441 (2009) ("Probable cause to expect that drugs will be present in a home is not established by the fact that the defendant lives there.") citing Commonwealth v. Cinelli, 389 Mass. 197, 213 (1983) cert. denied, 464 U.S. 860 (1983). Rather, in order for a search warrant for a residence to be valid, the search warrant affidavit must "contain sufficiently particularized information connecting the defendant's [residence] to his illegal . . . activities". Commonwealth v. Dillon, 79 Mass. App. Ct. 290, 294-295 (2011) citing Commonwealth v. Stegemann, 68 Mass. App. Ct. 292, 300 (2007). "The nexus must be both substantial and timely." Id. citing Cinelli, 389 Mass. at 213. In other words, "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is a reasonable cause to believe that the specific 'things' to be searched for and seized are located in the property to which entry is sought." Lopes, 578 F. Supp. 3d at 163 (D.Mass. 2021) citing Commonwealth v. Molina, 476 Mass. 388, 396 (2017).

"To establish the requisite nexus, the government must rely on 'timely information or else [the application] will fail." Kosta, 2013 WL 5934030, at *4 quoting United States v. Schaefer, 87 F.3d 562, 578 (1st Cir. 1996).

> For purposes of determining whether the information on which the search warrant was based was "stale," courts must look to all the facts and circumstances of the case, including the nature of the criminal activity under investigation, the length of time during which the criminal activity is alleged to have occurred, and the nature of the property to be seized." Id. at *2 quoting United States v. Bateman, 805 F. Supp. 1041, 1044–45 (D.N.H. 1992).

"It is well established that the temporal proximity or remoteness of the events observed has a bearing on the validity of a warrant." United States v. Dauphinee, 538 F.2d 1, 5 (1st Cir. 1976).

"If the evidence or contraband described is either easily movable, like a firearm, or consumable, like drugs, the information about its presence in a particular location has a very short shelf life." United States v. Wilder, No. CRIM.A. 04-10217-GAO, 2005 WL 1106922, at *5 (D.Mass. May 6, 2005), aff'd, 526 F.3d 1 (1st Cir. 2008). See also Commonwealth v. Hart, 95 Mass. App. Ct. 165, 168 (2019) ("standing alone, a gun's durability does not adequately support a belief that the firearm will still be in the home two months later"); United States v. Dumornay, No. 04-10309-GAO, 2006 WL 3050813, at *5 (D.Mass. October 25, 2006) ("the passage of more than a month and a half since the CI saw [the defendant] enter the house carrying the firearm made that information too remote in time for it to be relied upon to predict that the search of the premises would discover the weapon"). But see United States v. Ponzo, 853 F.3d 558, 573 (1st Cir. 2017) (holding neighbor's statement that he witnessed defendant bring firearm to shooting range four months earlier provided probable cause to search defendant's residence for firearm).

"Where the location of the search or seizure is a computer-like device, such as a cellular telephone, the opinions of the investigating officers do 'not, alone, furnish the requisite nexus between the criminal activity and the device to be searched' or seized." Commonwealth v. White, 475 Mass. 583, 589 (2016) quoting Commonwealth v. Anthony, 451 Mass. 59, 72 (2008); see also Lopes, 578 F. Supp. 3d at 163 (holding "conclusory statements that an individual's phone may store text messages and locational data related to a crime" insufficient to establish probable cause to search phone). "Rather, police first must obtain information that establishes the existence of some 'particularized evidence' related to the crime." White, 475 Mass. at 589 quoting Commonwealth v. Dorelas, 473 Mass. 496, 502 (2016). "'Information establishing that a person

9

may be guilty of a crime does not necessarily constitute probable cause to search' or seize the person's cellular telephone, even where the police believe, based on their training and experience in similar cases, that the device is likely to contain relevant evidence." Id. at 590 quoting Commonwealth v. Pina, 453 Mass. 438, 441 (2009).

In the case at bar, SA McKee's affidavit failed to establish a timely nexus between the items to be searched for and 5 Robert Drive. Information that the Defendant had placed an order for an illegal auto sear from the website portablewallhanger.com with a shipping address of 5 Robert Drive on February 8, 2020 is far too remote in time to be relied upon to predict the presence of such a highly portable item at 5 Robert Drive over two years later. Likewise, information that the Defendant placed orders for a solvent trap, a perfectly legal item designed for cleaning firearms, from a company called Alipay Singapore E-Commerce Private Limited with a shipping address of 5 Robert Drive on December 20, 2020 and December 24, 2020 is also too remote in time to be relied upon to predict the presence of such highly portable items at 5 Robert Drive over one year later. Moreover, SA McKee's affidavit provided no information, such as records from the United States Postal Service, UPS, or FedEx, confirming that the auto sear and/or solvent traps were ever in fact shipped and delivered to 5 Robert Drive. Nor did the affidavit contain information from any witnesses who ever observed said items inside 5 Robert Drive at any point in time. And with respect to the solvent traps, SA McKee's belief that the Defendant purchased the solvent traps to use as illegal silencers is not based on any specific articulable facts, but rather, is nothing more than pure speculation.

The statements from Officer Urbanski and an unnamed former associate/co-worker of the Defendant lend nothing to the nexus analysis as neither statement provides a timeframe for when the Defendant supposedly spoke about possessing auto sears and/or silencers. In fact, the unnamed

10

former associate/co-worker stated that he had distanced himself from the Defendant and had not spoken to the Defendant about weapons in years. And the statement from Officer Urbanski, who has known the Defendant for approximately 15 years, makes no mention of when during the course of those 15 years the Defendant discussed weapons with him. Equally important to the analysis is the fact that neither Officer Urbanski nor the unnamed former associate/co-worker ever stated that they knew the Defendant to keep auto sears and/or silencers at his home at 5 Robert Drive. On the contrary, the only locale mentioned by Officer Urbanski was that the Defendant would shoot guns at the McCray's Farm property.

Information that the Defendant made a $164.90 purchase from Black Rifle Depot on March 27, 2020 and a $64.98 purchase from 5D Tactical on March 30, 2020 adds nothing to the nexus analysis because said purchases predate the search warrant application by approximately two years, the nature of the items is entirely unknown, and it is unknown where the items were shipped to and/or stored at. Similarly, information that on October 13, 2020, November 27, 2020, and October 28, 2021 the Defendant's bank account paid for three perfectly legal firearms purchased from The Gun Rack, which were all registered to his son, Tyler, is irrelevant to whether illegal auto sears and/or silencers were likely to be found at 5 Robert Drive. SA McKee's "belief" that these "*may* be straw purchases" is nothing more than pure speculation. Furthermore, there was no specific information in SA McKee's affidavit indicating that any particular evidence of those purchases was likely to be found at 5 Robert Drive on February 17, 2022.

Finally, information that the Defendant made purchases from a company called Defense Distributed on November 12, 2020, August 10, 2021, and November 2, 2021 is also insufficient to establish a nexus between illegal contraband and 5 Robert Drive because it is entirely unknown what items were purchased, where the items were shipped to, and where the items were being

stored. Even when viewing all of these facts together, SA McKee's affidavit comes nowhere close to establishing probable cause to believe that auto sears, silencers, or any other illegal firearms-related evidence would be found at 5 Robert Drive on February 17, 2022.

With respect to the Defendant's cellular telephone and other electronic devices, the case for probable cause is even weaker. SA McKee's affidavit is devoid of any mention of the Defendant using a cellular telephone or other specific electronic device in connection with the purchases he is alleged to have made. SA McKee's conclusory statements that cellular telephones and other electronic devices may contain evidence related to criminal activity is insufficient to establish probable cause. Rather, particularized facts establishing a nexus are required. SA McKee's affidavit contains no such facts.

The only information provided in the affidavit concerning the Defendant's Facebook account is that the Defendant shared firearms-related posts on November 2, 2021, November 19, 2021, December 2, 2021, and January 22, 2022. The posts were not related to auto sears, silencers, or any other illegal firearm, but rather, concerned legal firearms for sale from various vendors. It is hard to imagine how such postings could possibly lead one to reasonably believe that the Defendant's Facebook account contained evidence of criminal activity.

Therefore, because SA McKee's affidavit failed to establish probable cause that 5 Robert Drive, the person of the Defendant, the Defendant's cellular telephone, the Defendant's Yahoo e-mail records, and the Defendant's Facebook records contained evidence of a crime, this Honorable Court should rule that all four search warrants are invalid.

B.  The Scope Of The Search Warrants Was Impermissibly Broad.

Pursuant to the Fourth Amendment, warrants must describe with particularity "the place to be searched, and the persons or things to be seized." **U.S. Const.** amend. IV. "The particularity

requirement serves as a safeguard against general exploratory rummaging by the police through a person's belongings." Commonwealth v. Balicki, 436 Mass. 1, 7 (2002) citing Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971). "[I]t both defines and limits the scope of the search and seizure, thereby protecting individuals from general searches, which was the vice of the pre-Revolution writs of assistance." Id. quoting Commonwealth v. Pope, 354 Mass. 625, 629 (1968).

"Although '[i]n the physical world, police need not particularize a warrant application to search a property beyond providing a specific address, . . . in the virtual world it is not enough to simply permit a search to extend anywhere the targeted electronic objects possibly could be found.'" Commonwealth v. Snow, 486 Mass. 582, 590 (2021) (emphasis in original) quoting Commonwealth v. Dorelas, 473 Mass. 496, 501-502 (2016). "For a cell phone search, such a limit is akin to no limit at all." Id. citing Kerr, Digital Evidence and the New Criminal Procedure, 105 Colum. L. Rev. 279, 303 (2005) ("limiting a search to a particular computer is something like . . . limiting a search to the entire city"). "[G]iven the properties that render [a modern cell phone] distinct from the closed containers regularly seen in the physical world, a search of its many files must be done with special care and satisfy a more narrow and demanding standard." Id. quoting Dorelas, 473 Mass. at 502; Riley v. California, 573 U.S. 373, 393 (2014) (noting that searches of physical items are to cell phone searches as "a ride on horseback" is to "a flight to the moon"). "[A]t a minimum, the standard for the proper scope of a cell phone search must be restricted to whether the evidence 'might reasonably be found in the electronic files searched.'" Id. at 591 quoting Dorelas, 473 Mass. at 503 n.13. Additionally, search warrants for cellular telephones and other electronic devices must be "sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search". Commonwealth v. Holley, 478 Mass. 508, 525 (2017) quoting Dorelas, 473 Mass at 511 n.8 (Lenk, J., dissenting).

But see United States v. Irons, 594 F. Supp. 3d 171, 177–78 (D. Mass. 2022) ("A warrant authorizing seizure of a suspect's home computer equipment and digital storage media for later off-site electronic search is not overbroad or unreasonable, as long as the probable-cause showing in the warrant application demonstrates a 'sufficient chance of finding some needles in the computer haystack.'") quoting United States v. Upham, 168 F.3d 532, 535 (1st. Cir. 1999).

"The magnitude of the privacy invasion of a cell phone search utterly lacking in temporal limits cannot be overstated." Snow, 486 Mass. at 593. "Consequently, to be sufficiently particular, a warrant for a cell phone search presumptively must contain some temporal limit." Id., at 594 citing United States v. Winn, 79 F. Supp. 3d 904, 921 (S.D. Ill. 2015); United States v. Zemlyansky, 945 F. Supp. 2d 438, 459 (S.D.N.Y. 2013) (noting temporal restriction is "indic[ium] of particularity" [citation omitted]).

> Because of the privacy interests at stake, the temporal restriction in an initial search warrant for a cell phone should err on the side of narrowness. If, during that initial search, officers uncover information giving rise to probable cause to broaden their search of the cell phone, nothing precludes them from returning to the judge and requesting a broader warrant. Id.

Although the scope of the search warrants for cellular telephones, computers, and other electronic devices found at 5 Robert Drive and on the Defendant's person was limited to information concerning the subject of the investigation, i.e. machine guns, auto sears, silencers etc., the scope of these two warrants was not limited in time. (See Exhibit 5, Attachment B-1, pp. 63-66, Attachment B-4, pp. 81-84). Consequently, the search warrants gave law enforcement free reign to review communications and data dating back to the very first day the Defendant acquired the electronic devices. This is a far cry from describing with particularity the place to be searched, and consequently, is an affront to the particularity requirement of the Fourth Amendment.

The search warrants for the Defendant's Facebook and Yahoo records suffer from the same temporal defect. (See Exhibit 5, Attachment B-2, pp. 68-74, Attachment B-3, pp. 76-79). But unlike the search warrants for the Defendant's electronic devices, the search warrants for the Defendant's Facebook and Yahoo records encompassed a far broader category of information to be searched. Id.

The search warrant for the Defendant's Facebook records authorized law enforcement to obtain and search "all data files" for the Defendant's Facebook account. (See Exhibit 5, Attachment B-2, p. 68). Said warrant was not limited to information concerning the subject of the investigation, but rather, permitted law enforcement to obtain information related to "biographical information", "information regarding [the Defendant's] activities on Facebook", "communications and messages published, sent or received by [the Defendant]", "information about [the Defendant's] associates", "information regarding [the Defendant's] physical location and movements", "all subscriber and transactional records", "addresses", "records of session times and durations", "length of service and types of service used", "telephone or instrument numbers", "other subscriber numbers or identities", and "means and source of payments". (Id. pp. 69-72).

Similarly, the search warrant for the Defendant's Yahoo e-mail records authorized law enforcement to obtain and search "all data files" for the Defendant's Yahoo account. (See Exhibit 5, Attachment B-3, p. 76). Said warrant was not limited to information concerning the subject of the investigation, but rather, permitted law enforcement to obtain

    1. The contents of all e-mail, whether draft, deleted, sent, or received;
    2. The contents of all text or instant messages;
    3. The contents of all electronic data files, whether word-processing, spreadsheet, image, video, or any other content;
    4. The contents of all calendar data;
    5. Lists of friends, buddies, contacts, or other subscribers;

6. Records pertaining to communications between the company and any person regarding these accounts and any e-mail accounts associated with those addresses, including contacts with support services and records of actions taken.

B. All subscriber and transactional records for the Subject Yahoo Account and any associated e-mail accounts, including:

1. Subscriber information for these and any associated e-mail accounts:
a. Name(s) and account identifiers;
b. Address(es);
c. Records of session times and durations;
d. Length of service (including start date) and types of service utilized;
e. Telephone instrument number of other subscriber number or identity, including any temporary assigned network address;
f. The means and source of payment for such service (including any credit card or bank account number); and
g. The Internet Protocol address used by the subscriber to register the account or otherwise initiate service.
2. User connection logs for any connections to or from these and any associated e-mail accounts, including:

a. Connection time and date;
b. Disconnect time and date;
c. The IP address that was used when the user connected to the service;
d. Source and destination of any e-mail messages sent from or received by the account, and the date, time, and length of the message; and
e. Any address to which e-mail was or is to be forwarded from the account or e-mail address. (Id., pp. 77-78).

The enormous breadth of both the Facebook and Yahoo search warrants can be characterized as nothing less than a general, exploratory search expressly prohibited by the Fourth Amendment. Therefore, because the scope of all four search warrants was impermissibly broad, this Honorable Court should rule that all four warrants are invalid.

C.     <u>The "Good Faith" Exception To The Exclusionary Rule Does Not Apply Because The Defects In the Search Warrants Were Both Readily Apparent And Went To The Heart Of The Nexus Requirement.</u>

"Fruits of unlawful searches are presumed to be excluded from evidence before the trier of fact at trial." <u>Kosta</u>, 2013 WL 5934030, at *2 <u>citing</u> <u>Mapp v. Ohio</u>, 367 U.S. 643, 655 (1961). However, pursuant to the "good faith" exception to the exclusionary rule, evidence obtained

16

pursuant to a warrant that is ultimately found to be invalid need not be suppressed if officers acted in objectively "reasonable reliance upon the magistrate's probable-cause determination and the technical sufficiency of the warrant". United States v. Leon, 468 U.S. 897, 922 (1984). The good faith exception is not applicable "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." Id. at 923 citing Franks v. Delaware, 438 U.S. 154 (1978). Nor does the exception apply "where the issuing magistrate wholly abandoned his judicial role" such that "no reasonably well trained officer should rely on the warrant." Id. The exception is also inapplicable where the supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. quoting Brown v. Illinois, 422 U.S., 590, 610–611 (1973) (Powell, J., concurring in part). "Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." Id. citing Massachusetts v. Sheppard, 468 U.S. 981, 988–991 (1984).

"[W]here the warrant's deficiency goes to the heart of the nexus requirement . . . suppression still serves the purpose of the exclusionary rule." Kosta, 2013 WL 5934030, at *8 (declining to apply good faith exception where last evidence of drug activity was six months prior to application for search warrant) citing United States v. Ricciardelli, 998 F.2d 8, 16 (1st Cir. 1993) (declining to apply good faith exception where lack of nexus between criminal activity and evidence to be seized was "glaring"); see also Lopes, 578 F. Supp. 3d at 164 (declining to apply good faith exception where affiant's conclusion that defendant was suspected shooter based on "speculation and weak (and largely unsupported) inferences"). "The government bears the 'heavy

17

burden' of proving that the good faith exception applies." Kosta, 2013 WL 5934030, at *7 citing United States v. Syphers, 426 F.3d 461, 468 (1st Cir. 1995).

As discussed in detail in Part I.A *supra*, the lack of probable cause was not a close call, but rather, was both readily apparent and went to the heart of the nexus requirement. And as discussed in detail in Part I.B *supra*, the unbridled scope of all four search warrants rendered them so facially deficient that the executing officers could not have reasonably presumed the warrants to be valid. Therefore, this Honorable Court should hold that the "good faith" exception to the exclusionary rule does not apply.

II.  THE DEFENDANT'S STATEMENTS TO LAW ENFORCEMENT SHOULD BE SUPPRESSED BECAUSE THEY WERE THE PRODUCT OF THE UNLAWFUL SEARCH AND SEIZURE.

A statement that is the product of an illegal search and seizure of evidence is subject to suppression under the "fruit of the poisonous tree" doctrine. See Wong Sun v. United States, 371 U.S. 471, 485 (1963) ("verbal evidence which derives . . . from an unlawful entry . . . is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion").

In the case at bar, the Defendant made two statements to law enforcement. The first statement was made in the parking lot of Stop and Shop immediately after being informed of the search warrants for his person and his home and immediately after his cellular telephone and house keys were seized. The second statement was made outside of 5 Robert Drive while federal agents were in the process of searching the home. As discussed in Part I *supra*, the search warrants for the Defendant's person and 5 Robert Drive were invalid. Consequently, the seizure of the Defendant's cellular telephone and the search of 5 Robert Drive were unlawful. The Defendant only agreed to speak to investigators because he knew what they were in the process of discovering pursuant to the invalid warrants. Therefore, because the Defendant's statements were the product

of an unlawful search and seizure, this Honorable Court should rule that the Defendant's statements must be suppressed as "fruit of the poisonous tree".

## CONCLUSION

For the reasons stated herein, the Defendant prays that this Honorable Court grant his Motion To Suppress Evidence.

Respectfully Submitted,

Dated: February 14, 2023    By: */s/ Peter Alexander Slepchuk*
Peter Alexander Slepchuk, BBO#: 682078
Attorney for the Defendant
155 Maple Street, Suite 405
Springfield, MA 01105
Tel: 413-736-3649; Fax: 413-747-9022
E-mail: peter.alexander@slepchuklaw.com

## CERTIFICATE OF SERVICE

I, Peter Alexander Slepchuk, hereby certify that on this 14th day of February, 2023, I served this document upon all registered parties via the ECF Notice of Electronic Filing (NEF) system.

Dated: February 14, 2023    */s/ Peter Alexander Slepchuk*
Peter Alexander Slepchuk